AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 1-7-2022)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Information associated with Two Target | )   Case No.  MJ22-498 |
| Accounts/Identifiers, for Investigation of 21 | ) |
| U.S.C. §§ 841 and 846 and Other Offenses | ) |

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A, located in: Western District of Washington there is now concealed property and evidence described in Attachment B.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Drug trafficking; conspiracy |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits.  Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of ___ days (give exact ending date if more than 30 days: <u>March 12, 2023</u>) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Abigail Sawyer, Special Agent
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by Telephone.

Date: <u>October 18, 2022</u>

_____
*Judge's signature*

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

City and state: <u>Seattle, Washington</u>

USAO NO. 2021R00038

1

**ATTACHMENT A**

2

**Property to Be Searched and Subscriber/Subject Information**

3

Records and information associated with the cellular telephone assigned call

4 number 253-670-4730, with "user" Gregory Espinosa, and billing party Celia J.

5 Moedano, (the "**Target Telephone 1**" or "**TT1**"), that are in the custody of AT&T

6 Wireless, a wireless telephone service provider headquartered at 208 South Akard Street

7 Dallas, Texas, 75202.  The user of **TT1** is Gregory ESPINOSA.

8

Records and information associated with the cellular telephone assigned call

9 number 253-670-1940, with "user" Celia J. Moedano, and billing party Celia J. Moedano,

10 (the "**Target Telephone 2**" or "**TT2**"), that are in the custody of AT&T Wireless, a

11 wireless telephone service provider headquartered at 208 South Akard Street Dallas,

12 Texas, 75202.  The user of **TT2** is Cesar GASTELUM.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to Be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding **TT1** and **TT2.** This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.    **Section I:  Information to be Disclosed by AT&T:**

1.    **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A:

a.    Names (including subscriber names, user names, and screen names);

b.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.    Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

d.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

e.    Length of service (including start date) and types of service utilized;

f.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Prospective Cell Site Location Information.**

a.      All information about the location of **TT1** and **TT2** described in Attachment A for **a period of 45 days from activation**, during all times of day and night. This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by **TT1** and **TT2.**

3.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of **TT1** and **TT2** described in Attachment A for **a period of 45 days**, during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by the Target Cell Phone.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control AT&T, AT&T is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), AT&T must

Attachment B - Phone - 3
USAO #2021R00446

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services.  The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

## II.  <u>Section</u> II:  Information to Be Seized by the Government

4.  All information described above in Section I that will assist in investigating ESPINOSA, GASTELUM, or unidentified subjects who are engaged in violating 21 U.S.C. §§ 841(a)(1), and 846.

5.  All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

6.  Location Information regarding **TT1** and **TT2.**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by AT&T in order to locate the things particularly described in this Warrant.

Attachment B - Phone - 4
USAO #2021R00446

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# AFFIDAVIT OF ABIGAIL SAWYER

STATE OF WASHINGTON          )
                             )     ss
COUNTY OF KING               )

I, ABIGAIL SAWYER, being first duly sworn, hereby depose and state as follows:

## PURPOSE OF THIS AFFIDAVIT

1.    I make this Affidavit in support of three warrants pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephones:

a.    **Target Telephone 1 (TT1),** with number **253-670-4730** (hereinafter "**TT1**") with service provided by AT&T Wireless, a wireless telephone service provider headquartered at 208 South Akard Street Dallas, Texas, 75202.  The listed user of the phone is Gregory Espinosa and user address is 12902 SE 312th St Apt E304 Auburn, WA 98092.  The listed billing party is Celia J. Moedano and billing address 12902 SE312th St Apt E304 Auburn, WA 98092.  The user of the phone is Gregory ESPINOSA.  **TT1** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

b.    **Target Telephone 2 (TT2),**  with number **253-670-1940** (hereinafter "**TT2**") with service provided by AT&T Wireless, a wireless telephone service provider headquartered at 208 South Akard Street Dallas, Texas, 75202.  The listed user and billing party is Celia J. Moedano.  The listed billing address is 12902 SE 312th St Apt E304 Auburn, WA 98092.  The user of the phone is Cesar GASTELUM Vega.  **TT2** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.    Based on the facts set forth in this Affidavit, I submit that there is probable cause that Gregory Espinosa ("ESPINOSA") and Cesar Gastelum Vega ("GASTELUM") are currently engaged in drug trafficking, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that ESPINOSA is currently using **TT1**, and GASTELUM is currently using **TT2**

AFFIDAVIT OF SA SAWYER - 1
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  during the commission of, and in furtherance of, these offenses. Obtaining location and

2  other information for these instrumentalities will further this investigation.

3         3.     This is the first federal application for a tracking warrant and pen register

4  for **TT1** and **TT2** in this judicial district in connection with this investigation.

5  **ECPA**

6         4.     The Court has jurisdiction to issue the proposed warrant for **TT1** and **TT2**

7  under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713,

8  because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.

9  Specifically, the Court is a district court of the United States that has jurisdiction over the

10  offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

11  **PEN REGISTER ACT**

12         5.     Because this warrant seeks the prospective collection of information that

13  falls within the statutory definitions of information collected by a "pen register" and/or

14  "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed

15  to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

16         6.     The Court has jurisdiction to issue the requested pen-trap order because it is

17  a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2). Specifically, the Court

18  is a district court of the United States that "has jurisdiction over the offense being

19  investigated" under 18 U.S.C. § 3127(2)(A)(i).

20         7.     This application includes all the information required by the Pen Register

21  Act. *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1). Namely, Exhibit 1 to this application is a

22  certification from Assistant United States Attorney Vincent T. Lombardi that

23  (1) identifies HSI as the law enforcement agency conducting the investigation and

24  (2) certifies the information likely to be obtained is relevant to an ongoing criminal

25  investigation being conducted by that agency. 18 U.S.C. § 3122(b). The Assistant

26  United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of

27  the Federal Rules of Criminal Procedure.

28

AFFIDAVIT OF SA SAWYER - 2
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8.      A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3). A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4).

9.      In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls. Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers. The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act. Accordingly, the requested warrants will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with the Target Cell Phone without geographic limit.

10.      The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachment B of the requested warrants that AT&T and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service. Any entity providing such assistance shall be reasonably compensated by the HSI, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrants.

11.      **Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).**

AFFIDAVIT OF SA SAWYER - 3
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**AGENT BACKGROUND**

12.     I am a Special Agent (SA) with Homeland Security Investigations ("HSI") within the United States Department of Homeland Security (DHS).  As a Special Agent, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801, et seq., and other violations of federal law.  I have been a Special Agent with HSI since June 2019.  I was trained to conduct investigations relating to violations of federal law including the manufacturing and trafficking of controlled substances and money laundering through the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  Prior to my employment with HSI, I was a Criminal Investigator with the New York County District Attorney's Office (DANY) for two years where I conducted long-term investigations involving fraud, organized crime, and narcotics.  I am a graduate of the Nassau County Police Academy and became a certified Police Officer in New York State for my position with DANY.

13.     As a federal law enforcement officer and through my employment as a law enforcement officer at the state level, I have received formal training, as well as extensive on-the-job training, in the investigation of narcotics trafficking.  I have conducted and participated in investigations involving controlled substances, money laundering, and other criminal activity, including those leading to arrest and prosecution.  As a result of these investigations, I have become familiar with methods and techniques used by narcotics manufacturers and distributors, persons in possession of narcotics for purposes of sales and transportation, and persons conspiring to transport and sell narcotics.  I am also familiar with the methods employed by narcotics traffickers to conceal their trafficking activity and the origin of proceeds generated by this activity.  I am aware that traffickers use slang and coded words, multiple cell phones, concealed compartments, "stash" houses to conceal their activities, and launder or otherwise conceal cash proceeds by hiding and transporting bulk cash, sending funds through wire transfers or bank accounts in other persons' names, or investing in assets placed in other persons' names.

AFFIDAVIT OF SA SAWYER - 4
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

14.     I have participated in the investigation described herein since approximately December of 2020.  I have obtained the facts set forth in this Affidavit through personal participation in the investigation described herein, from the review of records, documents, and other evidence obtained during this investigation, from surveillance operations, and from my conversations with other law enforcement officers familiar with the targets of this investigation.

15.     The facts set forth in this Affidavit are based on my own personal knowledge; information obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  The facts below do not include everything known to me about this investigation.  I have only included sufficient facts necessary to establish probable cause that ESPINOSA and GASTELUM are committing violations of violations of Title 21, United States Code §§ 841(a)(1) and 846 using **TT1** and **TT2,** respectively**.**  Significant additional details have been omitted for the sake of brevity.

16.     Where I have included statements of others, they are set forth in substance and in part, and are not direct quotations.

17.     Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of Title 21, United States Code §§ 841(a)(1) and 846 have been committed, are being committed, and will be committed by ESPINOSA and GASTELUM and that ESPINOSA is using **TT1** and GASTELUM is using **TT2** to facilitate their drug trafficking activities.  There is also probable cause to believe that the location information described in this Affidavit and in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

AFFIDAVIT OF SA SAWYER - 5
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## SUMMARY OF PROBABLE CAUSE

2 Background of Investigation: Las Vegas DTO

3      18.     In or about January 2021, I identified two phone numbers I believed

4 belonged to ESPINOSA based on toll analysis and subscriber information: 206-618-1751

5 and 253-487-9587.  During this time, I learned that these phone numbers were connected

6 to a drug trafficking organization (DTO) trafficking cocaine to and from the Las Vegas,

7 NV area that is being investigated by agents with the Drug Enforcement Administration

8 (DEA) Las Vegas office.

9      19.     I spoke to DEA Special Agent (SA) Daniel Weber who told me that one of

10 the main subjects of their investigation had communicated with one of ESPINOSA's

11 numbers, 206-618-1751, approximately 32 times in late October and early November of

12 2020.  A second telephone number belonging to ESPINOSA, 253-487-9587, had direct

13 contact with an individual in Mexico who DEA agents believed was directing the

14 narcotics trafficking activities of the Las Vegas DTO.  I analyzed call detail information

15 and noted that both ESPINOSA numbers spoke to several individuals that had been

16 identified as members of the Las Vegas DTO by DEA Las Vegas.  Further, I reviewed

17 financial records that revealed that ESPINOSA and several of the Las Vegas DTO

18 members conducted financial transactions with two business accounts that were flagged

19 by other federal investigations as possible shell companies used to facilitate the

20 laundering of drug proceeds.

21      20.     In February 2021, Customs and Border Protection (CBP) officers arrested

22 an individual linked to the Las Vegas DTO for transporting approximately 5.36

23 kilograms of cocaine in the dashboard of a vehicle through the San Ysidro Port of Entry

24 (POE).[1]  Later that month, DEA Las Vegas arrested several DTO members, several of

25 whom were in contact with ESPINOSA per phone toll analysis.  I reviewed airline

26

27 ─────────────────────

28 [1] The individuals arrested by CBP and DEA Las Vegas will not be named here as their cases are ongoing.

AFFIDAVIT OF SA SAWYER - 6
USAO 2021R00038

1 records and determined that ESPINOSA purchased flights for some of the Las Vegas

2 DTO members that were ultimately arrested for narcotics trafficking.

3 Pen Registers Authorized for ESPINOSA Numbers.

4      21.    Based on ESPINOSA's financial activity, travel patterns, and links to the

5 Las Vegas DTO, I applied for pen registers for the two numbers I believed to be used by

6 ESPINOSA: 206-618-1751 and 253-487-9587. On February 22, 2021, United States

7 Magistrate Judge Paula L. McCandlis authorized pen registers for both numbers through

8 AT&T and through WhatsApp under Western District of Washington Case No. PT21-

9 061. I observed that both phone numbers received few incoming calls and made no

10 outgoing calls. This likely indicates that ESPINOSA "dropped" both phones, meaning

11 that he stopped using these numbers. Based on my training and experience, drug

12 traffickers consistently abandon and switch phones that they use to conduct drug

13 trafficking activities in order to avoid detection by law enforcement.  I believe that

14 ESPINOSA had at least two phones and stopped using both numbers around the time the

15 pen registers were authorized. This is not consistent with normal cellphone users, who

16 generally have one phone and maintain the same phone number, even when changing

17 devices.

18      22.    I believe ESPINOSA is now using phone number **253-670-4730** (**Target**

19 **Telephone 1** or "**TT1**"). Per AT&T records, this phone's "user" is Gregory

20 ESPINOSA, and the billing part is Celia MOEDANO.  Toll analysis, financial records,

21 flight reservation records, and surveillance operations indicate **TT1** is used by

22 ESPINOSA, as will be discussed below.

23 Oklahoma City DTO.

24      23.    In September of 2022 I spoke to Federal Bureau of Investigation (FBI)

25 Investigative Analyst (IA) John Bernardo who works at the FBI's Oklahoma City office.

26 Per IA Bernardo, FBI agents in Oklahoma City searched a stash house in September

27

28

AFFIDAVIT OF SA SAWYER - 7
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2022.[2]  Per IA Bernardo, FBI agents believed that this Oklahoma City target may have been facilitating the construction of methamphetamine conversion laboratories based on their investigative findings.  Specifically, during the search of the Oklahoma City stash house, agents found a large number of wire receipts in the residence, in addition to materials they believed were evidence of a methamphetamine conversion laboratory.[3]  Per IA Bernardo, agents found wire receipts in the Oklahoma City stash house that they believed represented transfers made by fictitious names.  The wire receipts were associated with a variety of phone numbers.

24.     The analyst reported that one of these phone numbers, believed to be used by the Oklahoma City target, had numerous communications with phone number **TT1** per cellphone records.  I believe **TT1** is used by ESPINOSA, as will be discussed below.  Per the analyst, ESPINOSA and the Oklahoma City target were in contact in May 2022, a time period in which the Oklahoma City target was operating in the Oklahoma area.  In May 2022, ESPINOSA wired money from Oklahoma City to Mexico, as will be discussed below.

ESPINOSA's Travel between Oklahoma, California, Mexico and Washington.

25.     I queried ESPINOSA's name through a database of financial records and learned that ESPINOSA conducted several financial transactions in the Oklahoma City area.  For example, on May 15, 2022, ESPINOSA sent three wires (in the amounts of $807.00, $555.00, and $758.00) from Oklahoma City, OK to three different recipients in Nayarit, Mexico.  Also on June 9, 2022, ESPINOSA sent a wire for $1247.00 from Oklahoma City, OK to a recipient in Nayarit, Mexico.  The sender is listed as "Gregory G Espinoza" for all four of these transactions.  I believe despite the altered spelling of the

---

[2] The stash house had been abandoned by an individual who has been identified by FBI Oklahoma City but will not be named here as he/she is the target of an ongoing investigation.

[3] Methamphetamine conversion laboratories are generally home-made illicit laboratories in which liquid methamphetamine often originating in Mexico is converted into solid form after it has been transported to the US. Large DTOs use this method to traffic methamphetamine because liquid methamphetamine is easier to transport and conceal from law enforcement.

last name that ESPINOSA (whose middle name is "Genaro") was the sender of these wires.  Per the financial records, on one of the transactions on May 15, 2022, and the transaction on June 9, 2022, the sender presented Washington driver's license #WDLFMZPCE1FB, ESPINOSA's license.

26.     I know, based on my training and experience, that drug traffickers will often send proceeds of their illicit drug sales back to Mexico in smaller amounts via wire. Traffickers often structure or break up the wires into smaller amounts in an attempt to avoid alerting law enforcement, as larger transfers are sometimes more likely to attract attention.

27.     In September 2022, I queried ESPINOSA through Washington Department of Licensing (DOL) records and learned that a 2010 purple Ford Edge bearing Washington plate CCM9555 (the "purple Edge") is registered to him at 16127 SE 256th Place, Covington, WA, the "Covington address."  I queried this license plate through a database of License Plate Reader (LPR) information and determined that ESPINOSA's vehicle appeared to travel frequently between California and Oklahoma between April of 2022 and July of 2022.  DHS border crossing records indicate that ESPINOSA frequently crossed the US/Mexico border via the San Ysidro POE in southern California during this time period.  Airline records indicate that ESPINOSA also flew from San Diego, CA to Seattle, WA several times, often booking flights last minute, and staying in Seattle for about 48 hours during each trip between April and July of 2022.

28.     In sum, these data indicate that ESPINOSA made frequent short trips between California and Oklahoma, and California and Washington, and traveled to Mexico between these trips.  This travel pattern is consistent with how money and narcotics couriers typically operate; couriers bring narcotics or money from one destination to another, and travel as efficiently as possible in order to limit the time that they are exposed to law enforcement or members of rival DTOs.  These frequent trips are not consistent with the travel patterns of typical tourists or businesspeople who typically spend at least several days at their final destination before returning home.

AFFIDAVIT OF SA SAWYER - 9
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

29.    In October 2022, I reviewed DHS records, LPR data, and CBP data and observed that ESPINOSA made frequent trips that appear to be consistent with courier activity.  ESPINOSA's travel patterns are detailed as follows:

30.    On April 29, 2022, ESPINOSA crossed into the US from Mexico via the San Ysidro POE in the purple Edge.  LPR records show that on April 30, 2022, the license plate of the purple Edge was captured as the vehicle traveled eastbound near Albuquerque, NM.  On May 1, 2022, LPR records show the same vehicle continuing eastbound along Interstate 40 east of Amarillo, TX, just several hours away from Oklahoma City, OK.  ESPINOSA entered the US through the San Ysidro POE on May 4, 2022, indicating that between May 1, 2022 and this entry, ESPINOSA left the US.[4]  This means that that ESPINOSA likely traveled from Mexico into California, drove to Oklahoma City and traveled back to Mexico and crossed back into the US, again at the California border, in the span of several days.

31.    On May 4, 2022, ESPINOSA crossed into the US from Mexico at the San Ysidro POE in a black Ford Edge (the "black Edge") along with Cesar GASTELUM.  This vehicle is the same make and model as the other vehicle ESPINOSA traveled in (the "purple Edge").  Later in July of 2022, ESPINOSA registered this vehicle in his name at an address in Lynwood, CA under California license plate 9CDH033.  Based on my training and experience, I know it is common for couriers to drive vehicles that are of the same make and model once they have identified the natural voids in the vehicle or have determined the best smuggling methods for that type of vehicle.  I also know that once DTOs have successfully smuggled drugs or money in a certain type of vehicle, DTOs will continue to use that type of vehicle.

---

[4] DHS systems capture travelers and vehicles entering the United States, but often do not capture vehicles leaving the US.  For this reason, in many cases DHS databases do not have the exact date and time that ESPINOSA left the US and crossed into Mexico.  I can extrapolate based on ESPINOSA's crossings into the US that he left the US at some time before.

AFFIDAVIT OF SA SAWYER - 10
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

32.     On May 13, 2022, ESPINOSA crossed into the US from Mexico at the San Ysidro POE in the purple Edge.  Later that day, LPR data indicate that the plate of the purple Edge was captured as it travelled eastbound on I-40 near Albuquerque, NM. Phone toll analysis indicates that ESPINOSA used **TT1** to communicate with a phone number associated with the Oklahoma City target between May 14, 2022 and May 15, 2022.  These numbers did not communicate outside of this time range.  These data indicate to me that ESPINOSA was likely in Oklahoma City to meet with the Oklahoma City target or conduct business on the target's behalf.  On May 15, 2022, ESPINOSA sent three wire transfers from a location in Oklahoma City to three recipients in Mexico as is discussed above.  The Oklahoma City target also sent wire receipts from a variety of fictious names, as is discussed above.  Again, based on my experience investigating drug traffickers and cartel drug traffickers specifically, I know that it is common for couriers to send a portion of drug proceeds to cartel members immediately.  This reduces the likelihood that the currency will be intercepted by law enforcement or rival DTOs.

33.     Later on May 15, 2022, LPR data show that the purple Edge drove eastbound on 1-40.  Taken together these records indicate ESPINOSA made several short trips from California to Oklahoma City and back, and then drove south into Mexico before returning to the United States to repeat this pattern.  These trips are during the time period that ESPINOSA was in contact with the Oklahoma City target, and the Oklahoma City target was thought to be facilitating narcotics production and distribution in Oklahoma per the FBI analyst.  I believe based on my training and experience that ESPINOSA's travel patterns are consistent with courier activity.  Companies selling or transporting legitimate goods typically transport goods in bulk quantities for efficiency. DTOs typically split up loads of narcotics or money to reduce the risk of seizures by law enforcement, and because they use multiple couriers and therefore need to make multiple trips, like those that ESPINOSA took to Oklahoma City.

34.     On May 28, 2022, ESPINOSA crossed into the US from Mexico via the pedestrian lane at the San Ysidro POE, then flew from San Diego to Seattle.  ESPINOSA

AFFIDAVIT OF SA SAWYER - 11
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

flew back to San Diego on May 31, 2022, then crossed into the US from Mexico the following day, June 1, 2022. On June 3, 2022, LPR data show the purple Edge driving east on 1-40 near Amarillo, Texas. On June 4, 2022, ESPINOSA returned to the US from Mexico through the San Ysidro POE via a pedestrian lane.

35.     On the same date, ESPINOSA flew to Seattle from San Diego, and then returned to San Diego on June 6, 2022. On June 7, 2022, ESPINOSA entered the US through the San Ysidro POE in the purple Edge. LPR data show the purple Edge driving eastbound along 1-40 near Albuquerque, NM later that day. On June 9, 2022, ESPINOSA sent a wire transfer to Mexico from Oklahoma City. On June 10, 2022, LPR data show the purple Edge driving westbound along 1-40 in this middle of the night. ESPINOSA entered the US via the San Ysidro POE in the purple Edge, on June 11, 2022, again indicating that he drove from California to Oklahoma City and back in a matter of days. This rapid travel back and forth between California and Oklahoma are consistent with courier activity.

36.     After ESPINOSA entered the US on June 11, 2022 via a pedestrian lane, he flew from San Diego to Seattle. On June 13, 2022, ESPINOSA sent a wire transfer in the amount to $990 from Kent, Washington to a recipient in Nayarit, Mexico, and then flew back to San Diego. ESPINOSA crossed back into the US on June 14, 2022, and LPR data show the purple Edge driving eastbound along I-40 near Albuquerque, NM. The next day, LPR data show the purple Edge driving westbound along 1-40 near Amarillo, TX and then near Albuquerque, NM early in the morning on June 16, 2022.

37.     On June 21, 2022, ESPINOSA crossed into the US through the San Ysidro POE in the purple Edge. LPR data shows the purple Edge near Los Angeles later that day. On June 23, 2022, ESPINOSA sent a wire transfer in the amount of $1480.00 from Kent, Washington to a recipient in Nayarit, Mexico. There are no flight records for ESPINOSA around this time, likely indicating that he drove from California to Washington. ESPINOSA conducted another wire transfer in the amount of $1500.00 from Kent, WA to a recipient in Nayarit, Mexico on June 25, 2022.

AFFIDAVIT OF SA SAWYER - 12
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

38.     On July 6, 2022, ESPINOSA entered the U.S through the San Ysidro POE in the purple Edge. On the same date, LPR records indicate the purple Edge drove eastbound along 1-40 near the Arizona/New Mexico border.  On July 8, 2022, LPR records show the purple Edge driving westbound along I-40 near Amarillo, TX, and then westbound along 1-40 near Holbrook, Arizona.  On July 9, 2022, ESPINOSA drove through a Border Patrol check point in Winterhaven, CA, heading westbound from the direction of Arizona to California at an area in close proximity to the US/Mexico border.

39.     On July 20, 2022, ESPINOSA crossed back into the U.S via the San Ysidro POE in the purple Edge.  DHS databases revealed that later on July 20, 2022, ESPINOSA drove the purple Edge eastbound through Border Patrol checkpoints in Imperial County, California and Yuma, Arizona.   LPR records show the purple Edge continuing eastbound along I-40 through Holbrook, Arizona, Gallup, New Mexico and Amarillo, TX later on July 20, 2022.

40.     On July 21, 2022, ESPINOSA was stopped by a deputy with the Gray County Sheriff's Office (GCSO) while travelling westbound on I-40 near Amarillo, TX for violating the speed limit.  Deputies with GCSO arrested ESPINOSA for violating Texas Penal Code 34.02: Money Laundering >=$2,500<$30K, as detailed below.

July 22, 2022 Traffic Stop by Gray County (TX) Sheriff's Office.

41.     In September of 2022, I obtained the arrest report for ESPINOSA's arrest on July 21, 2022.  The paragraphs that follow include some of the information I learned from my review of this report.  This information serves as a summary of some of the information contained in the report rather than a transcript of the report.

42.     Per the report, on July 21, 2022, GCSO Deputy Blake Mangus observed the purple Edge driving at a rate of speed higher than the posted speed limit and conducted a traffic stop.  Deputy Mangus identified the driver and sole occupant of the vehicle as ESPINOSA from his WA driver's license.

43.     Per the report, Deputy Mangus made small talk with ESPINOSA while he wrote a warning for the traffic offense and asked where ESPINOSA was traveling.

ESPINOSA told the deputy he was travelling to Amarillo, TX from Oklahoma, where he had been visiting his grandfather for three days. Per the report, ESPINOSA told the deputy he was living in Phoenix, AZ. Per the report, the deputy asked ESPINOSA if there was anything illegal in the vehicle, to which ESPINOSA replied there was not. ESPINOSA granted the deputy permission to search the vehicle. Per the report, the deputy found several thousand dollars in one-hundred-dollar bill denominations inside of ESPINOSA's wallet. The deputy found additional currency in a Coach bag and located a grocery bag containing several thousand dollars rubber banded together in small bills.

44.     Per Deputy Mangus, "Based on the way the money was hidden, banded, and my prior experience with money laundering cases I believed that ESPINOSA was engaged in Criminal Activity." The deputy advised ESPINOSA of his Miranda rights in Spanish. ESPINOSA stated that he understood his rights and would talk to the deputy about the money located in his vehicle. Per the report, after the deputy confronted ESPINOSA with his suspicions that ESPINOSA was engaged in criminal activity, ESPINOSA said, "How is it illegal if its [sic] under ten thousand dollars?"

45.     Deputy Mangus then obtained LPR information and noted that the vehicle had travelled eastbound through California and Arizona on July 20, 2022 (as is discussed above), the date prior to the traffic stop. This is inconsistent with ESPINOSA's story that he had been in Oklahoma for three days. ESPINOSA told the deputy he thought he had approximately six to seven thousand dollars. The deputy knew based on the search that ESPINOSA in fact had more than this amount of currency. Based on ESPINOSA's inconsistent statements and the currency discovered in his vehicle, the deputy transported ESPINOSA to the police station to interview him further. At the Sheriff's Office, ESPINOSA changed his story and admitted that he had left Tijuana, Mexico, drove to Phoenix, AZ to see some friends, and then drove 22 hours to Oklahoma, and arrived at 11:00 PM on July 20, 2022. ESPINOSA stated that that morning (July 21, 2022), he woke up, spent time with family in Oklahoma, went to the river walk, and left to go to Amarillo at 9:00 PM. Per Deputy Mangus, "Prior to giving this final statement of his

travel itinerary, ESPINOSA's story had changed 3 times. I asked ESPINOSA why he would travel 22 hours straight just to turn around the following day and return and he said that he just wanted to travel."

46.    Deputy Mangus asked for permission to look at ESPINOSA's phone in his presence, and ESPINOSA agreed and supplied the pin number.  Deputy Mangus observed a contact named "Seattle" and noted that on June 16, 2022, ESPINOSA sent a photo of what appeared to be cocaine to this individual.  Per Deputy Mangus' report, ESPINOSA sent the message (translated from Spanish by the deputy), "When you occupy your corner, I have it ready," and then the message "Pure rock bro."  Deputy Mangus noted that this was likely a reference to crack cocaine, but I believe ESPINOSA was likely emphasizing the quality of the cocaine to "Seattle."  Deputy Mangus observed that on June 29, 2022, ESPINOSA sent a picture of a bag of cocaine to "Seattle" and sent the message (translated from Spanish by the deputy), "What's up bro, I have it for you if you're ready, pure fucking rock."  Per the report, ESPINOSA told Deputy Mangus that ESPINOSA was a middleman for a transaction between "Seattle" and a friend and said that he made $300 as a result of the transaction.  ESPINOSA said the money had nothing to do with his recent trip and said that he had been saving up money. Per the report, ESPINOSA stated that he took $11,000.00 in cash with him because he prefers to pay in cash.  Per the report, ESPINOSA estimated he had $8,000 to $9,000 at this time.  Deputy Mangus later found the total to be $11,367.00.  Deputy Mangus advised ESPINOSA that he believed that the money and vehicle were being used in the commission of a crime, namely Manufacture/Delivery of a Controlled Substance.  The deputy placed ESPINOSA under arrest for Money Laundering.  The cellphones located in the vehicle were seized pending a search warrant.

47.    In September of 2022, I spoke to Deputy Mangus.  He relayed to me the information in the above report.  He added that he noted that ESPINOSA was using WhatsApp to send the above-described messages to "Seattle."  ESPINOSA was released several days later on bond.

AFFIDAVIT OF SA SAWYER - 15
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

July 28, 2022 Border Patrol Observations

48.     On the evening of July 29, 2022, several days after ESPINOSA's arrest, DHS records indicate that ESPINOSA crossed through a Border Patrol checkpoint in Campo, CA while driving westbound on Interstate 8 in the black Edge. Based on my review of DHS databases, this vehicle was now registered to ESPINOSA under license plate 9CDH033. Per DHS databases, Border Patrol agents conducted a secondary inspection of the vehicle with the comments:

> "Subject stated he lives in TJ [Tijuana, Mexico] and bought the car in Los Angeles about a month ago. Subject said he was coming from Mesa Arizona where he went to work in the fields for the day and was now going home to TJ…Positive K9 alert. Tooling was found on the gas tank cover as well as new bolts in the engine however, negative findings. Two microphones were found within the vehicle along the drivers [sic] side. Subject was released without incident."

49.     Per the Border Patrol agent's comments, it appears that ESPINOSA's vehicle may have been used for transporting narcotics at one time based on the positive canine alert. Furthermore, the tooling on gas tank and new bolts on the engine may indicate that the vehicle was tampered with, a common practice used by drug traffickers to conceal narcotics or currency to avoid detection by law enforcement. Further, the Border Patrol agents found microphones in the driver's side of the vehicle. Based on my training and experience I know that high-ranking members of DTOs often track couriers who transport narcotics or currency using a variety of methods including tracking their location on their phones, and through recording devices like the microphones found in the vehicle.

50.     A few hours later, DHS border crossing records show ESPINOSA crossed outbound to Mexico via the San Ysidro POE in the black Edge. ESPINOSA remained in Mexico until October 8, 2022.

AFFIDAVIT OF SA SAWYER - 16
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Surveillance of ESPINOSA on October 8, 2022, Confirmation of **TT1**.

51.     In my initial investigation of ESPINOSA, I identified a SnapChat account I believed he was using: "GEspinosa314." I viewed SnapChat account "GEspinosa314" from an undercover SnapChat account and observed that the profile under this username includes the vanity name "Gregory Espinosa," ESPINOSA's full name. Additionally, I have viewed multiple "stories" from "GEspinosa314" featuring an individual I recognized to be Gregory ESPINOSA from his WA driver's license (WDLFMZPCE1FB).

52.     On October 6, 2022, I viewed a "story" posted by ESPINOSA to SnapChat account "GEspinosa314." This story featured a screenshot of an airline reservation confirmation of an American Airlines flight (operated by Alaska Airlines) from San Diego to Seattle departing on Saturday, October 8, at 1:30 PM. ESPINOSA added the comment "Ya era hora" with an emoji meaning "it was time" in Spanish per Google Translate.

53.     On October 6, 2022, I served American Airlines with a subpoena for flight reservation information for ESPINOSA. On October 7, 2022, American Airlines provided reservation records for ESPINOSA. Per these records on October 6, 20222 ESPINOSA booked American Airlines flight #7525 from San Diego, CA to Seattle, WA departing San Diego at 1:30 PM (the same flight visible in the SnapChat story). ESPINOSA listed **TT1** as his phone number per these reservation records. On October 8, 2022, I queried this flight through a public search engine and determined that the flight would be landing at SeaTac International Airport at gate N15 at approximately 4:20 PM.

54.     On October 8, 2022, I was present at gate N15 at SeaTac International Airport. At approximately 4:19 PM, I observed an individual I recognized to be ESPINOSA disembark from flight 7525 at gate N15. I observed ESPINOSA enter the men's restroom, then exit, and enter the AirTrain to depart the airport. I noted that ESPINOSA appeared to be talking on the phone as he walked.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

55.     At approximately 4:26 PM, as ESPINOSA was on the AirTrain, HSI SA Scott Fusco placed a phone call to **TT1** from a blocked number.  SA Fusco heard a male voice answer the phone, "Hello?" and was able to hear an announcement from the AirTrain in the background.  Simultaneously, I observed ESPINOSA answer his phone, which appeared to be a smartphone in a light blue case, and heard ESPINOSA say "Hello?"

56.     Per AT&T records, the billing party for **TT1** is Celia MOEDANO, and the user party is Gregory ESPINOSA.[5]  I queried WA DOL records and determined that Celia Jasmin Gastelum MOEDANO has WA Driver's license WDL4R562533B, which lists her current address as the Covington address.  ESPINOSA's WA driver's license WDLFMZPCE1FB also lists his current address as the Covington address. Cesar GASTELUM, an associate of ESPINOSA's, has WA driver's license WDL55B15F5SB, which also lists his current address as the Covington address.  I believe MOEDANO and GASTELUM are husband and wife based on their shared address and MOEDANO's last names which include "Gastelum."

57.     Based on these observations in tandem with subscriber records, financial records, and flight reservation records, I believe ESPINOSA is the user of **TT1**.

58.     I continued to surveil ESPINOSA and observed him depart the AirTrain at baggage claim.  ESPINOSA was picked up by an unidentified man in a Toyota Tacoma. Surveillance units observed the Tacoma drive to the Covington address.

59.     I drove past the residence several minutes after the Tacoma arrived and observed an individual inside of the garage of the residence I recognized to be Cesar GASTELUM from his Washington driver's license photo (WDL55B15F5SB).

/ / /

---

[5] Both MOEDANO and ESPINOSA listed the address 12902 SE 312th St Apt E304, Auburn, WA 98092 in AT&T records.  Per a commercially available database of public records, this address was associated with both ESPINOSA and MOEDANO.

AFFIDAVIT OF SA SAWYER - 18
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Identification of **TT2** and Cesar GASTELUM.

60.     In March of 2022, I learned from DEA SA Weber that agents had continued to investigate members of the Las Vegas DTO that had not been arrested in the February 2021 takedowns.  SA Weber told me that phone number **253-670-1940** (**TT2**) was in communication with Las Vegas DTO members.

61.     Per AT&T records, the "user" and billing party of **TT2** is of the phone is Celia MOEDANO, the wife of Cesar GASTELUM.  This is the same billing party listed for **TT1**.  Based on my training and experience, I know it is common for narcotics traffickers to conceal their identities, and often register cars or phones under the names of other people, including their spouses.  I had previously identified **TT2** because it was in contact with both phone numbers associated with ESPINOSA (206-618-1571 and 253-487-9587), the phones that had been dropped prior to February 2021.   Per call detail analysis, **TT2** has been in regular contact with **TT1**, ESPINOSA's current cellphone, since at least March 2022.  Call detail records show that **TT1** and **TT2** have continued to communicate regularly.

62.     SA Weber stated that he believed the user of **TT2** was Cesar GASTELUM. Per SA Weber, during the spring of 2022, GASTELUM was observed on at least two occasions in the Las Vegas area meeting with members of the Las Vegas DTO.  SA Weber told me that based on DEA's investigation, he believed GASTELUM transported narcotics to the Las Vegas area and picked up bulk currency from Las Vegas DTO members.  DEA Las Vegas arrested the main targets in this investigation; they have no new information regarding GASTELUM since these arrests took place.

63.     In September 2022, I reviewed immigration crossing records and flight records and learned the following: On August 7, 2022, GASTELUM booked a flight from Seattle, WA to Mazatlan, MX that departed on August 12, 2022.  GASTELUM used the phone number 253-670-1940, **TT2**, in his reservation request.  GASTELUM was on board this flight, which landed in Mazatlan at approximately 12:21 PM on August 12, 2022.  Per DHS databases, GASTELUM entered the US via the Otay Mesa POE in a

pedestrian lane the following day, August 13, 2022 at approximately 5:00 PM.   The abbreviated period of time GASTELUM spent in Mexico is consistent with drug courier activity and inconsistent with normal tourist or travel activity.

64.    I spoke to SA Weber again in October 2022, and he informed me that investigators had received information that the Las Vegas DTO was starting to move large quantities of methamphetamine in the Oklahoma area.  This is consistent with links between ESPINOSA and the Oklahoma City DTO, discussed above.

65.    Phone toll analysis indicates that **TT2** has continued to communicate with a Las Vegas number that overlaps with the DEA Las Vegas case.  **TT1** and **TT2** have also had recent contact with numbers with Mexican area codes that are connected to the same case.

Conclusion.

66.    Based on the foregoing information, I believe that Gregory ESPINOSA and Cesar GASTELUM are involved in trafficking narcotics and laundering drug proceeds for a large scale DTO with connections in Mexico, Washington State, Oklahoma, and Nevada.  I believe that ESPINOSA uses **Target Telephone 1** and that GASTELUM uses **Target Telephone 2** to facilitate the trafficking of narcotics.

## Knowledge Regarding Cellular Phones

67.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by

AFFIDAVIT OF SA SAWYER - 20
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   pen-traps and indicate the identity of the cellular device making the communication

2   without revealing the communication's content.

3        68.    Based on my training and experience, I know that when a cell phone

4   connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the

5   cellular antenna or tower, and the cellular antenna or tower records those identifiers as a

6   matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular

7   antenna or tower -- are like the telephone number of an incoming call.  They can be

8   recorded by pen-trap devices and indicate the identity of the cell phone device making the

9   communication without revealing the communication's content.  In addition, a list of

10  incoming and outgoing telephone numbers is generated when a cell phone is used to

11  make or receive calls, or to send or receive text messages (which may include

12  photographs, videos, and other data). These telephone numbers can be recorded by pen-

13  trap devices and then used to identify the parties to a communication without revealing

14  the communication's contents.

15       69.    Based my training and experience, I know that a cell phone can also be

16  used to exchange text messages with email accounts.  The email addresses associated

17  with those text messages can be recorded by pen-trap devices and then used to identify

18  parties to a communication without revealing the communication's contents.

19       70.    Based on my training and experience, I know that cellular phones can

20  connect to the internet via a cellular network.  When connecting through a cellular

21  network, internet communications sent and received by the cellular phone each contain

22  the same unique identifier that identifies cellular voice communications, such as an ESN,

23  MEIN, MIN, SIM, IMSI, MSISDN, or IMEI.  Internet communications from a cellular

24  phone also contain the IP address associated with that cellular phone at the time of the

25  communication.  Each of these unique identifiers can be used to identify parties to a

26  communication without revealing the communication's contents.

27       71.    In my training and experience, I have learned that AT&T is a wireless

28  company that provides cellular telephone access to the general public.  I also know that

AFFIDAVIT OF SA SAWYER - 21
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  certain providers of cellular telephone service have technical capabilities that allow them

2  to collect and generate information about the locations of the cellular telephones to which

3  they provide service, including E-911 Phase II data (also known as GPS data or latitude-

4  longitude data) and cell-site data (also known as "tower/face information" or cell

5  tower/sector records).  E-911 Phase II data provides relatively precise location

6  information about the cellular telephone itself, either via GPS tracking technology built

7  into the phone or by triangulating on the device's signal using data from several of the

8  provider's cell towers.  Cell-site data identifies the cell towers (i.e., antenna towers

9  covering specific geographic areas) that received a radio signal from the cellular

10 telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the

11 telephone connected.  These towers are often a half-mile or more apart, even in urban

12 areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to

13 a wireless device does not necessarily serve every call made to or from that device.

14 Accordingly, cell-site data is typically less precise that E-911 Phase II data.

15       72.    Based on my training and experience, I know that AT&T can collect E-911

16 Phase II data about the location of the Target Cell Phone, including by initiating a signal

17 to determine the location of the Target Cell Phone on AT&T's network or with such

18 other reference points as may be reasonably available.

19       73.    When using a cellular connection to receive or transmit data, a cellular

20 phone typically utilizes a cell tower to make telephone calls, send or receive text

21 messages, send or receive emails, surf the internet, carry out application initiated data

22 transfers, among other things.

23       74.    Based on my training and experience, I know that AT&T can collect cell-

24 site data about the Target Cell Phone.  Based on my training and experience, I know that

25 for each communication (including data connections) a cellular device makes, its wireless

26 service provider can typically determine: (1) the date and time of the communication; (2)

27 the telephone numbers involved, if any; (3) the cell tower to which the customer

28 connected at the beginning of the communication; (4) the cell tower to which the

AFFIDAVIT OF SA SAWYER - 22
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   customer connected at the end of the communication; and (5) the duration of the

2   communication.  I also know that wireless providers such as AT&T typically collect and

3   retain cell-site data pertaining to cellular devices to which they provide service in their

4   normal course of business in order to use this information for various business-related

5   purposes.

6       75.     Different service providers use different systems, applications, and reports

7   to collect or analyze cell site data.  These systems, applications, and reports are referred

8   to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon),

9   Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD"

10  (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE,

11  Timing Advance, and TruCall.  RTT data, for example, estimates the approximate

12  distance of the cellular device from a cellular tower based upon the speed with which

13  signals travel between the device and the tower.  This information can be used to estimate

14  an approximate location range that is more precise than typical cell-site data.

15      76.     Based on my training and experience, I know that wireless providers such

16  as AT&T typically collect and retain information about their subscribers in their normal

17  course of business.  This information can include basic personal information about the

18  subscriber, such as name and address, and the method(s) of payment (such as credit card

19  account number) provided by the subscriber to pay for wireless communication service.  I

20  also know that wireless providers such as AT&T typically collect and retain information

21  about their subscribers' use of the wireless service, such as records about calls or other

22  communications sent or received by a particular device and other transactional records, in

23  their normal course of business.  In my training and experience, this information may

24  constitute evidence of the crimes under investigation because the information can be used

25  to identify the Target Cell Phone's user or users and may assist in the identification of co-

26  conspirators and/or victims.

27      77.     Modern cell phones allow users to switch their telephone numbers, use

28  multiple telephone numbers on a single device, and transfer their telephone number to a

AFFIDAVIT OF SA SAWYER - 23
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

different cell phone.  These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone.  To provide for any such changes made to the Target Cell Phone, Attachment A specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

## Knowledge Regarding Drug Trafficking

78.    Based on my training and experience, including experience obtained through my participation in this and other investigations involving the distribution of controlled substances, including those targeting long-term conspiracies responsible for the distribution of controlled substances, and based upon my consultation with other experienced law enforcement agents and officers, I know that:

a.    Those involved in the distribution of illicit drugs often travel by car, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, or to transport drugs or, cash drug proceeds.

b.    Illicit drugs are frequently transported into the United States and between cities within the United States in bulk, high-purity form, and drug traffickers attempt to mask the distinct odors of particular drugs during such transport through the use of heat

sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease. Likewise, money is similarly transported in bulk. It is common for drug traffickers to maintain hidden compartments within passenger vehicles, items altered for the purpose of hiding or concealing drugs, and items purchased and converted for the use of storing their drugs.

c.     Those involved in the distribution of illicit drugs often use money remittance businesses to assist in moving and distributing the money earned from their drug trafficking activities. By using these businesses to wire funds to other parts of the United States and beyond, the drug traffickers are attempting to hide this money and its source from law enforcement.

d.     Drug traffickers frequently make use of cellular telephones to arrange their drug transactions. These telephones are frequently pre-paid cellular telephones. Drug traffickers frequently provide little or no identifying information to the phone company, and oftentimes the information provided is false. Drug traffickers often discontinue the use of these cellular telephones on a frequent basis in order to thwart law enforcement efforts at detection.

79.     In my experience, the geographic location information requested in this Affidavit is useful in drug trafficking and money laundering investigations as the information can be used to: (1) aid surveillance during suspected drug deals; (2) help locate and identify target residences, DTO stash houses, and other storage locations; (3) help identify where known and unknown conspirators live and the vehicles they drive; (4) help identify sources of supply, customers, and other unknown conspirators who assist in the distribution of narcotics and/or help launder the cash drug proceeds; (5) help understand geographic breadth of the DTO how and where conspiracies operate; (6) help identify locations of money transfer businesses used by members of the conspiracy to launder cash drug proceeds or through which money is exchanged between co-conspirators; and (7) help identify transportation sources used by the conspirators.

80.     Based upon my training and experience, one way to identify co-conspirators is to covertly follow suspect vehicles with electronic tracking devices known to be utilized in furtherance of drug trafficking and money laundering offenses, and then conduct an investigation using those names and addresses.  Based upon the location information, I would then direct other investigators to conduct surveillance at the addresses and determine if criminal activity was occurring there, which in turn could lead to potential names of conspirators and potential narcotics storage locations used by the DTO.  Obtaining this location information from target vehicles, as well as target phones, is critical to accurately identifying such co-conspirators and locations, as the residences of the targets are often times in either remote, rural areas, or small residential neighborhoods, which make close, physical surveillance by agents almost impossible to accomplish without being discovered by the suspects.

## AUTHORIZATION REQUEST

81.     Based on the foregoing, I request that the Court issue the proposed search warrants and pen-trap order, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C.      § 2703(c), and 18 U.S.C. § 3123.

82.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice to the subscriber or user of **TT1** and **TT2** until 90 days after the collection authorized by the warrants has been completed. There is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **TT1** and **TT2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(l).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrants authorize the seizure of any wire

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or

2  electronic information, there is reasonable necessity for the seizure for the reasons set

3  forth above.  *See* 18 U.S.C. § 3103a(b)(2).

4       83.    I further request that the Court direct AT&T to disclose to the government

5  any information described in Attachment B that is within the possession, custody, or

6  control of AT&T. I also request that the Court direct AT&T to furnish the government all

7  information, facilities, and technical assistance necessary to accomplish the collection of

8  the information described in Attachment B unobtrusively and with a minimum of

9  interference with AT&T's services, including by initiating a signal to determine the

10  location of **TT1** and **TT2** on AT&T's network or with such other reference points as may

11  be reasonably available, and at such intervals and times directed by the government. The

12  agency shall reasonably compensate AT&T for reasonable expenses incurred in

13  furnishing such facilities or assistance.

14       84.    Pursuant to 18 U.S.C. § 2703(g), the government will execute these

15  warrants by serving the warrants on AT&T. Because the warrants will be served on

16  AT&T, who will then compile the requested records and data, reasonable cause exists to

17  permit the execution of the requested warrants at any time in the day or night. I therefore

18  request that the Court authorize execution of the warrants at any time of day or night,

19  owing to the potential need to locate **TT1** and **TT2** outside of daytime hours.

20                   **REQUEST FOR SEALING AND DELAYED NOTICE**

21  To avoid seriously jeopardizing this ongoing, multi-state investigation into this DTO and

22  to avoid the risk of the suspects' potential flight from prosecution and destruction of

23  evidence prior to indictment, I request that the Court order the application, this Affidavit,

24  the prior Affidavits, the tracking warrants, and the returns, be sealed until further order of

25  the Court.  These documents discuss an ongoing criminal investigation that is neither

26  public nor known to the targets of the investigation.  Based upon my knowledge, training,

27  and experience, it is my belief that making these documents publicly available and

28  providing immediate notification of the execution of these warrants will have an adverse

AFFIDAVIT OF SA SAWYER - 27
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    result on this investigation, as defined at Title 18, U.S.C., Section 2705 (a)(2), and would

2    likely result in the targets' flight from prosecution, the destruction of or tampering with

3    evidence, the intimidation or retaliation against potential witnesses, and otherwise

4    seriously jeopardize the ongoing investigation.  Accordingly, there is good cause to seal

5    these documents because their premature disclosure may seriously jeopardize that

6    investigation.  For the same reasons, and because this investigation is likely to take at

7    least 90 days to conclude, given its breadth and geographic scope, which includes

8    agencies operating in Nevada, Oklahoma, and California among other locations, I request

9    a delay of 90 days to provide requisite notice I request permission to delay providing the

10    requisite notice of the tracking warrants for a period of 90 days and, if needed, may seek

11    an extension of this request at that time.

13    Abigail Sawyer, Affiant
Special Agent
Homeland Security Investigations

17    Subscribed and sworn to before me this 18th day of October, 2022.

20    HON. MARY ALICE THEILER
United States Magistrate Judge

AFFIDAVIT OF SA SAWYER - 28
USAO 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**EXHIBIT 1**

<u>DECLARATION</u>

I, Vincent T. Lombardi, declare as follows:

1.      I am a duly appointed Assistant United States Attorney for the Western District of Washington, and I have primary responsibility for representing the interests of the United States herein.

2.      I make this declaration in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.

3.      Pursuant to 18 U.S.C. § 3122(b), I certify that the Homeland Security Investigations is the law enforcement agency conducting the investigation in this matter and that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by that agency.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Application is made on the basis of information officially furnished, and on that basis I verily believe such information to be true.

Executed this 18th day of October, 2022.


_s/ Vincent T. Lombardi_
VINCENT T. LOMBARDI
Assistant United States Attorney

Exhibit 1 - Declaration - 1
USAO # 2021R00038

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970